FILED
2023 Mar-31  PM 04:41
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DONALD LYONS and JILLIAN LYONS,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **Case No. 5:21-cv-00043-LCB** |
| **SAEILO, INC., d/b/a KAHR ARMS,** | § § § | |
| **Defendant.** | § § | |

## OPINION & ORDER

Plaintiffs Donald and Jillian Lyons bring this product liability action against Defendant Saeilo, Inc., which does business as Kahr Arms. Plaintiffs allege that Mr. Lyons's 9mm Kahr CW9 semi-automatic pistol discharged when it fell from his holster and hit their garage floor, severely injuring him. Plaintiffs bring claims for negligence or wantonness, violation of the Alabama Extended Manufacturers' Liability Doctrine ("the AEMLD"), breach of implied warranty of merchantability, and loss of consortium. (Doc. 1 at 8−14.)

Before the Court are two motions: Kahr's motion to exclude the expert testimony of Plaintiffs' liability expert, Charles Powell, and Kahr's motion for summary judgment under Federal Rule of Civil Procedure 56. (Docs. 51 and 53.) For the reasons given below, the Court finds that part of Mr. Powell's testimony is

1

admissible under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), but even with that testimony, Plaintiffs cannot preclude a finding of summary judgment in favor of Kahr. Thus, Kahr's motion to exclude is **GRANTED IN PART** and **DENIED IN PART**, and Kahr's motion for summary judgment is **GRANTED**.

## I.      BACKGROUND

Plaintiffs base their claims for relief—and Kahr, its motions—on the following facts.

### A.      The Mechanics of Kahr's CW9 Semi-Automatic Pistol

Kahr designs, manufactures, markets, and sells firearms. (Doc. 1 at 4.) One of Kahr's firearms is the 9mm CW9 semi-automatic pistol. (Doc. 1 at 4.) The CW9 pistol is striker-fired. (Doc. 59 at 7.) In a striker-fired pistol, a spring-loaded rod, called a striker, replaces the hammer and firing pin that operate in a traditional pistol. (Doc. 59 at 7.) To load the CW9 pistol, a magazine with at least one round (i.e., a bullet) must be inserted into the pistol's magazine well. (Doc. 54 at 8.) Then the slide (i.e., the top part of the pistol that moves) must be manually pulled back. (Doc. 54 at 8.) As the slide gets released forward, it loads a round in the chamber. (Doc. 54 at 8.) At that point, the pistol is cocked, or ready to fire. When the trigger is pulled and the pistol discharges or fires, the slide springs rearward and then

forward, chambering another round—this action is what makes the pistol semi-automatic.  (Doc. 58-5 at 5.)

As part of Kahr's design for the CW9 pistol, the trigger connects to a trigger bar. (Doc. 58-5 at 5.) At the other end of the trigger bar is a disconnector tab. (Doc. 58-5 at 5.) Unlike the trigger, both the trigger bar and the disconnector tab are internal components. (Doc. 58-5 at 5.) The disconnector tab connects to the cocking cam system,[1] and it also interacts with the slide. (Doc. 58-5 at 5.) As the slide moves rearward or forward,[2] it pushes the disconnector tab downward, so the trigger bar gets disconnected from the cocking cam system. (Doc. 58-5 at 5.) Said differently, when the slide is out of battery, the pistol cannot discharge. (Doc. 58-5 at 5.) When the slide is in battery, or in its fully forward position, the trigger bar is connected to the cocking cam system. (Doc. 58-5 at 5.) This disconnector tab design is common in striker-fired pistols. (Doc. 58-5 at 5.)

When a striker-fired pistol is cocked, the striker is pulled back against spring pressure and held by a fire control mechanism component. (Doc. 59 at 7.) The CW9 pistol uses a cocking cam system to control and release the striker. (Doc. 51 at 2 and Doc. 58-5 at 4.) One cam, often referred to as the sear, is the component that holds the striker when the pistol is cocked. (Doc. 58-5 at 4.) Stated previously, the disconnector tab on the trigger bar connects the trigger to the cocking cam

---

[1] This system is described in the next paragraph.
[2] Another term for this action or movement is "out of battery." (Doc. 58-5 at 5.)

system. (Doc. 51 at 2.) As the trigger gets pulled rearward, the trigger bar shifts forward, and the cocking cam system rotates, causing the sear to pull the striker back even further. (Doc. 60 at 2.) When the system fully rotates, the sear releases the striker, which springs forward and hits the bullet cartridge's primer, projecting the cartridge out of the pistol. (Doc. 60 at 2.)

One of the internal safety mechanisms in the CW9 pistol is the striker block. (Doc. 51 at 2.) The striker block "keeps the firing pin [which is part of the striker] from contacting the primer of the cartridge." (Doc. 51 at 2.) During a trigger pull, the second cam in the cocking cam system pushes the striker block out of the way so that when the striker gets released by the sear, the firing pin can hit the primer. (Doc. 51 at 2 and Doc. 58−5 at 4.)

Similar to other striker-fired semi-automatic pistols, such as the Glock G17, the CW9 pistol does not have an external manual safety mechanism, such as a conventional safety (i.e., an on/off switch). (Doc. 58-5 at 4.) It also does not have a trigger safety, which is a small tab on the trigger that must be fully decompressed or "pushed in" before the trigger can be pulled. (Doc. 58-5 at 3.) A trigger safety is found on some semi-automatic pistols but not all. (Doc. 51 at 4.)

### B.    The Incident on July 2, 2019

On January 12, 2010, Kahr sold a CW9 semi-automatic pistol, serial number EE4752, ("the Subject Pistol") to Larry's Pistol and Pawn Shop. (Doc. 54 at 5.)[3] An individual purchased the Subject Pistol later that year. (Doc. 54 at 5.) Roughly ten years later, Plaintiffs purchased the Subject Pistol at an auction. (Doc. 54 at 5.) The maintenance history and the conditions of the Subject Pistol from late 2010 to the time of Plaintiffs' purchase are unknown. (Doc. 54 at 5.)

After purchasing the Subject Pistol, Mr. Lyons disassembled it, cleaned it, and completed a functions check. (Doc. 54 at 7.) Mr. Lyons also bought a leather holster for the Subject Pistol, which did not have a retention strap. (Doc. 54 at 8.) He would carry the Subject Pistol in the holster around his property with one round in the chamber and a full magazine inserted in the magazine well. (Doc. 54 at 8.)

Before the incident at issue, Mr. Lyons used the Subject Pistol on two separate occasions: once at a range where he shot multiple rounds, and the week before the incident where he discharged it several times on his property, both at a target and at rats. (Doc. 54 at 7.) Mr. Lyons testified in his deposition that on both occasions, the Subject Pistol functioned properly. (Doc. 54 at 7.)

On July 2, 2019, Mr. Lyons returned home from work and began mowing the lawn with the holster and the Subject Pistol affixed to the belt on the Scottish

---

[3] Though many of the facts in this section are cited from Kahr's motion for summary judgment, Plaintiffs deemed such facts "admitted" in their brief opposing Kahr's motion. (Doc. 59 at 3−6.)

kilt he was wearing. (Doc. 54 at 9.) Two hours later, Mrs. Lyons told him there was a snake trying to enter the house through the garage, so he went and tried to catch the snake by the tail. (Doc. 54 at 9.) As Mr. Lyons leaned down to pick up the snake, the Subject Pistol fell out of the holster, struck the concrete floor, and discharged. (Doc. 1 at 7.) There is no evidence that Mr. Lyons bumped into anything when he leaned down. (Doc. 53 at 10.) A bullet struck Mr. Lyons in the "upper right leg, traveled through his abdomen, passed through his colon, nicked his bladder, struck his iliac vein, and penetrated his left pelvic bone" before stopping near the skin of his left buttocks. (Doc. 1 at 7.) Mr. Lyons's injuries resulted in multiple surgeries and extensive medical treatment and rehabilitation. (Doc. 1 at 7.)

## C.   Experts' Testing and Examination of the Subject Pistol

On January 12, 2021, Plaintiffs filed their Complaint against Kahr in this Court. (Doc. 1.) During discovery, on October 28, 2020, Plaintiffs' expert, Charles Powell, and Kahr's expert, Derek Watkins, examined the Subject Pistol together. (Doc. 54 at 10.) That day was the only time the Subject Pistol was examined or tested by either expert. (Doc. 51-10 at 13.)

During their inspection, Mr. Powell and Mr. Watkins noticed some scratches on the slide's rear, damage to the front sight, and at least some damage to the disconnector tab. (Doc. 51-7 at 7−8 and Doc. 58-5 at 18−24.) Mr. Powell later

claimed he saw corresponding microscopic scratches on the slide's inner surface, which Mr. Watkins did not see. (Doc. 51-7 at 7−8 and Doc. 51-10 at 11−12.) Both Mr. Powell and Mr. Watkins tested the Subject Pistol's functionality, which included testing specific components and disassembling and reassembling the firearm, and they found that everything functioned properly. (Doc. 54 at 10.)

In order to complete his analysis, Mr. Powell purchased his own Kahr CW9 pistol ("the Exemplar") to run some tests. (Doc. 51-10 at 12.) Mr. Powell is a registered engineer who for the past forty years has "engaged in the business of engineering failure analysis of products and structures and accident investigation." (Doc. 58-5 at 2.) In November 2021, Mr. Powell completed ten drop tests with the Exemplar onto concrete using a drop box. (Doc. 51-10 at 12, 40.) The first drop test was conducted from 48 inches, and the next nine were conducted from 60 inches. (Doc. 54 at 12.) During those ten tests, the Exemplar never discharged on impact with the concrete. (Doc. 54 at 11−12.)

That same month, Mr. Powell began experimenting with the Exemplar by placing small pieces of brass or polymer in the cavity where the disconnector tab sits, and he would manipulate the pieces until they held the tab and trigger bar forward, causing a partial trigger pull. (Doc. 54 at 12−13.) He analyzed the Exemplar in that condition using his TriggerScan system. (Doc. 51-10 at 20.) Shortly thereafter, Mr. Powell completed his expert report for this lawsuit where he

wrote that the CW9 pistol is defectively designed and should have a trigger safety. (Doc. 58-5 at 1, 4−5.) Roughly two months later, he conducted one drop test from 60 inches with the Exemplar's trigger partially pulled, and the firearm discharged on impact. (Doc. 58 at 13.)

Kahr completed its own testing during discovery. Kahr completed fourteen drop tests with its exemplar CW9 pistol, including six drops onto concrete. (Doc. 51-7 at 3.) The drops onto concrete were from a height of 39 inches. (Doc. 51-7 at 4.) None of Kahr's drop tests resulted in a discharge (i.e., a drop-fire). (Doc. 51-7 at 9.) Mr. Watkins, also an engineer, then completed his expert report where he concluded that the CW9 pistol does not have any design defects and does not drop fire. (Doc. 51-7 at 2, 16.)

## II.   LEGAL STANDARDS

### A.   Motion to Exclude Expert Testimony

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b)   the testimony is based on sufficient facts or data;
> >
> > (c)   the testimony is the product of reliable principles and methods; and

> (d)  the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court in *Daubert* held that Rule 702 requires that the district court serve as the "gatekeeper" of evidence and determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. All scientific testimony or evidence admitted must be both relevant and reliable. *See id.* at 589–92. The court "must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue." *Id.* at 592−93.

To determine whether an expert's testimony is admissible under Rule 702 and *Daubert*, the Eleventh Circuit established a three-part test:

1. The expert is qualified to testify competently regarding the matters he intends to address;

2. The methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

3. The testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand or to determine a fact in issue.

*E.g.*, *Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010). The proponent of the expert's testimony bears the burden of proving, by a preponderance of

evidence, that the testimony satisfies the three-part test. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

The district court's "'role as gatekeeper is not intended to serve as a replacement for the adversary system.'" Fed. R. Evid. 702 advisory committee's notes to 2000 amendment (citing *United States v. 14.38 Acres of Land Situated in Leflore Cnty., Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996)). In conducting a *Daubert* analysis, the district court cannot evaluate the credibility of an expert, nor can it "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois U.K. Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (internal citations omitted). Thus, "courts must remain chary not to improperly use the admissibility criteria to supplant a plaintiff's right to a jury trial: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. at 596).

## B.    Motion for Summary Judgment

Summary judgments are "an integral part of the Federal Rules [of Civil Procedure] as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). To obtain summary judgment, the movant must demonstrate that

all material facts are undisputed and entitle him to a judgment on the merits. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). That burden requires the movant to point out portions of the record or pleadings that justify summary judgment. Fed. R. Civ. P. 56(a).

"[B]ut the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. "A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of her pleading"; he "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." *Id.* at 248 (citation omitted) (cleaned up); *accord* Fed. R. Civ. P. 56(e). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citations omitted). To that end, evidence that "is merely colorable" or otherwise "is not significantly probative" cannot preclude summary judgment. *Anderson*, 477 U.S. at 249 (citations omitted).

Applicable substantive law distinguishes the material from the immaterial. *Id.* And there can be "no genuine issue as to any material fact" where the nonmovant is unable, after adequate discovery, to "make a showing sufficient to

establish the existence of an element essential to [its] case" under the applicable substantive law. *Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990) (citations omitted). Dispensing with just one legal element of the non-movant's claim "necessarily renders all other facts immaterial," in which case "the plain language of Rule 56(c) mandates the entry of summary judgment." *Celotex*, 477 U.S. at 322.

The district court's inquiry turns upon "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. In engaging with that inquiry, the court is "required to view the evidence and all factual inferences therefrom in the light most favorable to [the nonmovant] and to resolve all reasonable doubts about the facts in her favor." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1341 (11th Cir. 2022) (citation omitted). Should "conflicts arise between the facts evidenced by the parties," the court "must credit the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) (citation omitted).

## III.    DISCUSSION

### A.    Mr. Powell's expert testimony is admissible, in part, under *Daubert* and Federal Rule of Evidence 702.

Mr. Powell, Plaintiffs' expert, is prepared to testify that Kahr's CW9 semi-automatic pistol is defectively designed and that its defects caused the Subject Pistol to drop fire and injure Mr. Lyons. (Doc. 60 at 2.)

12

Mr. Powell's opinion rests on his evaluations and tests of both the Subject Pistol and the Exemplar. (Doc. 58-5 at 6.) With the Subject Pistol, he examined it with his own eyes and under a microscope, he took pictures and measurements of it, and he conducted function tests with it, which included disassembling and reassembling the firearm and testing individual components. (Doc. 54 at 10 and Doc. 58-5 at 6.) During his time with the Subject Pistol, Mr. Powell made several observations. He noticed that the disconnector tab was damaged, and he saw microscopic scratches on the inner surface of the slide where it had contact with the disconnector tab. (51-10 at 11−12.) Mr. Powell then arrived at two conclusions: one, that the damage he saw suggested that there had been contact with some type of debris or foreign material because he had "[n]ever seen a disconnector tab look like that before," and, two, that the level of contact between the slide and disconnector tab was unusual and not the result of "normal use." (Doc. 51-10 at 12, 14, and 36−37.) Additionally, while observing the Subject Pistol under the microscope, when Mr. Powell pulled the slide rearward and then released it, he saw the slide drag the disconnector tab forward slightly, though the trigger did return to the full position. (Doc. 51-10 at 13, 16, 27.)

Mr. Powell then conducted drop tests with the Exemplar onto concrete using a drop box. (Doc. 51-10 at 12, 40.) While watching a video of one of the first drop tests, he noticed the Exemplar's trigger move rearward. (Doc. 51-10 at 40.)

Following that observation, he "measured the position of the striker block safety and what height it would take to release it and then mark[ed] that on the trigger [guard]." (Doc. 51-10 at 40.) During his observations of subsequent drop tests, he noticed that the trigger moved to the marked spot on the trigger guard, indicating that the striker block had been displaced. (Doc. 58-5 at 31−32.) Mr. Powell conducted eleven drop tests total. (Doc. 60 at 13.) The first drop test was conducted from 48 inches, and the rest were conducted from 60 inches. (Doc. 54 at 12.) During the first ten tests, the Exemplar never discharged on impact. (Doc. 54 at 11−12.)

Circling back to his conclusion that a piece of debris or foreign material had damaged the Subject Pistol, for the eleventh test with the Exemplar, Mr. Powell wanted to "exhibit" the kinds of damage he saw on the Subject Pistol. (Doc. 51-10 at 14, 55, 58.) He proceeded to place brass and polymer particles in the Exemplar's cavity where the disconnector tab was in order to block the tab forward and create a partial trigger pull.[4] (Doc. 54 at 12−13.) After analyzing the Exemplar in that condition with his TriggerScan system, he realized the firearm would drop fire; he later conducted one drop test, and the Exemplar discharged on impact. (Doc. 58 at 13, 20.)

---

[4] Mr. Powell described the "partial trigger pull" as "[p]retty close to discharge." (Doc. 51-10 at 55, 58.)

Following his findings, Mr. Powell reported that the CW9 pistol has two design defects: (1) when the CW9 pistol gets dropped, inertial energy causes the trigger to move and the striker block to move out of the way, "meaning the gun could . . . fire[]" ("the First Theory"); and (2) the lack of protection of the disconnector tab wherein the slide or debris in that cavity can move the tab forward, causing a partial trigger pull ("the Second Theory"). (Doc. 59 at 12 and Doc. 58-5 at 5) (emphasis omitted). The Second Theory breaks down into two causation hypotheses as to how the Subject Pistol could have discharged when it fell from Mr. Lyons's holster and hit the concrete: (a) there was debris or foreign material within the cavity where the disconnector tab sits that held the tab and trigger bar forward and caused a partial trigger pull; or (b) due to the damage on the disconnector tab caused by debris or foreign material, there was enough contact between the tab and the slide to hold the tab and trigger bar forward, causing a partial trigger pull. (Doc. 51-10 at 14, 28.) Mr. Powell opined that had Kahr designed the CW9 pistol with a trigger safety, the two defects would have been cured, and Mr. Lyons's injury would have been prevented. (Doc. 58-5 at 5.)

Kahr now moves to exclude Mr. Powell's testimony, claiming that he "improperly worked backwards from the assumption that [the Subject Pistol] did, in fact drop fire, failing to account for any other reasonable alternative for the discharge." (Doc. 51 at 2.) Plaintiffs maintain that Mr. Powell's opinion satisfies

the Eleventh Circuit's test for admissibility under *Daubert* and Rule 702, and they deny Kahr's characterization of his opinion. (Doc. 60 at 1.)

      1.   *Qualification*

Kahr does not debate that Powell is "qualified to testify competently" regarding design defects in the CW9 pistol. Nevertheless, Plaintiffs point out that Mr. Powell is a metallurgical engineer who has, for the past forty years, worked in the business of failure analysis of products. (Doc. 60 at 8.) Plaintiffs also emphasize Mr. Powell's significant experience in the design and failure of "firearm control and safety systems." (Doc. 58-5 at 2–3 and Doc. 60 at 9.) Experience may provide a sufficient foundation for expert testimony. Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. Because the Court finds that Plaintiffs have sufficiently established that Mr. Powell's experience qualifies him to testify competently, the first part of the Eleventh Circuit's test has been satisfied.

      2.   *Methodology*

Kahr's overarching argument is that Powell's methodology is unreliable because he failed to rule out alternative causes of the incident (i.e., a trigger pull), he ignored pertinent facts, and his testing lacks scientific methodology. (Doc. 51 at 17−20.)

Plaintiffs oppose Kahr's arguments, claiming Mr. Powell did rule out the alternative that Mr. Lyons pulled the Subject Pistol's trigger and that his drop tests

were reliable because they were systematic and conducted in accordance with a military standard used by Kahr itself. (Doc. 60 at 11–13.)

The Supreme Court and the Federal Rules of Evidence Advisory Committee Notes have set forth a variety of factors courts may consider when determining if an expert's methodology is scientifically reliable. A handful of those factors are: "whether the expert's methodology has been tested or is capable of being tested; . . . whether the technique has been generally accepted in the proper scientific community;" *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 509 U.S. at 593–94); and "[w]hether the expert has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.

That said, the Supreme Court has emphasized that an inquiry under Rule 702 is a "flexible one" and that the factors listed do not "do not constitute a definitive checklist or test." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal citation omitted). The "factors . . . may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* (internal citation omitted). Thus, a court's assessment of the reliability of a methodology largely "depends upon the particular circumstances of the particular case at issue." *Id.* The focus of a *Daubert* inquiry is on the "principles and methodology underlying expert opinion

testimony, not the conclusions they generate." *McDowell*, 392 F.3d at 1298 (citing

*Daubert*, 509 U.S. at 595).

As a preliminary matter, the Court finds it logical to first analyze Mr.

Powell's opinion that the Subject Pistol drop fired and his general methodology

before addressing his specific methodologies that support the First and Second

Theories.

a.    <u>Alternative Cause</u>

The Court disagrees with Kahr that Mr. Powell failed to rule out alternative

causes of the incident. There are only two ways that the Subject Pistol could have

discharged on July 2, 2019: a drop-fire, the Plaintiffs' position, or a manual trigger

pull, Kahr's position. During Mr. Powell's deposition, he testified that he evaluated

whether the Subject Pistol "fired as a result of a manual trigger pull or if it fired

without a manual trigger pull," and in this case, he ruled out a manual trigger pull.

(Doc. 51-10 at 10.) To reach that conclusion, he reviewed the evidence available to

him, including Mr. Lyons's deposition, the Sheriff's Report, and the Subject Pistol

itself. (Doc. 60 at 11). Mr. Lyons described the incident during his deposition,

stating that he heard the shot as he reached down, that the firearm did not hit

anything as the area was empty, and that he saw a flash to the floor on his right.

(Doc. 51-4 at 23–25.) The Sheriff's Report reiterated Mr. Lyons's story and stated

that the hospital confirmed both that Mr. Lyons was hit in the right thigh and that

18

the bullet traveled at an upward angle. (Doc. 51-19 at 3.) From that, Mr. Powell reasoned that Mr. Lyons's wound path, low to high, "indicat[ed] a muzzle up drop onto the rear top corner of the slide." (Doc. 58-5 at 5.) On the Subject Pistol, Mr. Powell found "impact damage" on the top righthand corner of the slide. (Doc. 58-5 at 5.) The damage he saw was "typical of the kinds of impact marks [he] see[s] on pistols that drop fire," and he claimed he saw the "imprint of the concrete particles" within the groves under the microscope. (Doc. 51-10 at 69−70.) He also thought that the striker block "exhibited an impact mark," which signaled to him that the Subject Pistol's striker had released previously, sans trigger pull. (Doc. 58-5 at 5.) Based on Powell's review of those materials, he concluded that Mr. Lyons's injury was the result of a "dropped pistol discharge" and not a manual trigger pull. (Doc. 58−5 at 1.)

Kahr claims that the materials Mr. Powell relied on to rule out a manual trigger pull, specifically Mr. Lyons's deposition and the Sheriff's Report, are not based on scientific analysis. (Doc. 62 at 7−8.) Kahr also points out that Mr. Powell did not attempt any independent trajectory analysis. (Doc. 51 at 13.) While Kahr's arguments may have merit, Mr. Powell did rely on Mr. Lyons's wound path and what he observed in the Subject Pistol, which, based on his expertise, suggested a drop-fire. Moreover, Kahr's points would be the proper subject of cross-examination and should not affect the admissibility of Mr. Powell's testimony.

Thus, the Court finds that it was appropriate for Mr. Powell to rely on the evidence as provided to him as well as his own observations in eliminating a manual trigger pull as an alternate cause of the Subject Pistol's discharge.

### b.   Drop Tests with the Exemplar

It is a "generally accepted" technique in the firearms industry to conduct drop tests in order to determine whether a firearm can discharge upon being dropped, and Kahr, which conducted its own drop tests, does not take issue with the fact that Mr. Powell did so as well.[5] Additionally, Mr. Powell conducted multiple iterations of the drop tests, and he adequately explained his step-by-step process, so his tests could be repeated, if necessary. (Doc. 51-10.) Those facts indicate that Mr. Powell's general methodology was scientifically reliable.

Kahr argues that the heights Mr. Powell used during the drop tests—48 and 60 inches—are beyond the industry's standards and beyond the height the Subject Pistol fell,[6] rendering his methodology unreliable. But the Court disagrees. The evidence in the record suggests that it is well known throughout the firearms industry that there are different drop-test protocols.[7] (Doc. 54 at 6 and Doc. 58-2 at

---

[5] In light of that information, the Court deems it unnecessary to give more detail on Mr. Powell's step-by-step process for his drop tests.

[6] The test heights that Mr. Powell used are undisputedly higher than the distance the Subject Pistol fell from Mr. Lyons's waist because Mr. Lyons is roughly 71 inches tall (i.e., 5'9"). (Doc. 54 at 9.)

[7] These include protocols promulgated by the Sporting Arms and Ammunition Manufacturers' Institute, the California Department of Justice, the State of Massachusetts, and the Department of Defense. (Doc. 54 at 6 and Doc. 58-5 at 4.)

24.) In Mr. Powell's report, he wrote that the drop-test height of 60 inches, which was used for ten of his drop tests, was in accordance with the Military Standard 810 and Test Operations Procedure 3-2-045. (Doc. 58-5 at 4.) Kook Jin Justin Moon, Kahr's corporate representative, testified in his deposition that Kahr's firearms had been tested using that very standard. (Doc. 58-2 at 24.) Moreover, Mr. Powell conducted the drop tests to analyze whether the CW9 pistol had a design defect that could cause a drop-fire. Regardless of how far the Subject Pistol fell, it is conceivable that someone could drop a CW9 pistol from shoulder height, so data collected from drop tests at 48 and 60 inches would be relevant to Mr. Powell's analysis. Therefore, the Court finds that Mr. Powell's use of those heights for his tests does not render his methodology scientifically unreliable.

c.    <u>The First Theory—Methodology</u>

The Court now turns to the methodology underlying the First Theory. While watching a video of one of the drop tests, Mr. Powell saw the Exemplar's trigger move rearward. (Doc. 51-10 at 40.) Following that observation, he "measured the position of the striker block safety and what height it would take to release it and then mark[ed] that on the trigger [guard]." (Doc. 51-10 at 40.) On subsequent video recordings of drop tests, he found that the trigger moved to the marked spot on the trigger guard, indicating that the striker block was displaced. (Doc. 51-10 at 40.) Mr. Powell, in his deposition, gave a detailed description of how he tested the

First Theory, and he verified his finding on multiple drop tests. (Doc. 51-10 at 30.) The Court finds that Mr. Powell's methodology was methodical and that his process is testable. The Court also acknowledges that Kahr does not contest this specific methodology. As such, the methodology behind the First Theory is scientifically reliable.

d.      The Second Theory—Methodology

Lastly, the Court pivots to the methodology behind Mr. Powell's Second Theory, which is the primary focus of Kahr's motion. It is worth noting that Plaintiffs glossed over the Second Theory in their brief. They state that Mr. Powell's experimentation was his attempt to "replicate the damage" in the Subject Pistol, but they do not advance an argument as to why his methodology is scientifically reliable. (Doc. 60 at 14.) That aside, because Plaintiffs and Mr. Powell brought up the Second Theory at the Court's hearing, and thus have not abandoned it, the Court will analyze it under *Daubert*.

The crux of Kahr's argument is that Mr. Powell assumed that the Subject Pistol drop fired and then "worked backwards" to find a theory that would make it possible. (Doc. 51 at 2.) Kahr claims that Mr. Powell manipulated the Exemplar by intentionally creating a partial trigger pull by inserting particles of brass and polymer into the firearm, which he only did because he "realized he could not get the [Exemplar] to drop fire." (Doc. 51 at 18.)

22

But the Court cannot say, as Kahr does, that Mr. Powell's actions here had "no connection to the facts of the case." (Doc. 51 at 19.) Mr. Powell did state that he observed damage to the Subject Pistol's disconnector tab and scratches to the slide's inner surface, which he concluded was highly unusual and thus not the result of wear and tear but interaction with debris or foreign material. (Doc. 51-10 at 12, 14, 36−37.) He also claimed that he saw the slide in the Subject Pistol drag the disconnector tab forward slightly and that he manipulated the Exemplar's trigger to replicate what he saw in the Subject Pistol. (Doc. 51-10 at 55, 58.) From Mr. Powell's TriggerScan analysis of the Exemplar in that condition, he could tell the pistol would drop fire, and his conclusion was validated when he conducted the eleventh drop test and the pistol discharged on impact. (Doc. 58 at 13, 20.) Based on that information, there is at least a traceable, though tenuous, connection between Mr. Powell's observations of the Subject Pistol, his data, and the Second Theory.

While no evidence suggests that Mr. Powell's manipulation of the Exemplar's trigger is a "generally accepted" technique in the firearms industry, in his deposition, Mr. Powell testified how, exactly, he applied the technique, enough so that it could be replicated, and he mentioned that he had used that technique to manipulate the trigger in other firearms. (Doc. 51-10 at 51−56, 64.) It is an established principle in any field of science that hypotheses should be tested,

which, based on Mr. Powell's testimony, is what he did. (Doc. 51-10 at 55.) To find that Mr. Powell "worked backwards" to make the CW9 pistol drop fire would require the Court to assess Mr. Powell's credibility, which it cannot do under a *Daubert* analysis. The Court admits that the underlying "facts" Mr. Powell relies on to support his methodology and the Second Theory—the damage to the disconnector tab, the scratches on the slide, and the slight dragging of the disconnector tab by the slide—are shaky, at best, and are borderline "sufficient." Fed. R. Evid. 702. However, given that the Court should not "serve as a replacement for the adversary system," it will err on the side of admissibility. Fed. R. Evid. 702 advisory committee's notes to 2000 amendment (citing *14.38 Acres of Lan*, 80 F.3d at 1078). Thus, under these "particular circumstances," and given Mr. Powell's expertise in analyzing firearm design failures, the Court adopts a "flexible" interpretation of scientific reliability and finds that Mr. Powell's "underlying reasoning and methodology" for the Second Theory meet that standard. *Kumho*, 526 U.S. at 150.

Overall, the second part of the Eleventh Circuit's test has been satisfied.

### 3.   *Assistance to the Trier of Fact*

Kahr claims that Mr. Powell's testimony does not assist a trier of fact because his own testimony states that the First Theory had no causal effect on Mr. Lyons's injury. (Doc. 62 at 5−6.)

The third part of the Eleventh's Circuit test '"goes primarily to relevance."'
*Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 989 (11th Cir. 2016) (citing
*Daubert*, 509 U.S. at 591). "The 'basic standard of relevance . . . is a liberal one,'
but if an expert opinion does not have a 'valid scientific connection to the pertinent
inquiry' it should be excluded because there is no 'fit.'" *Boca Raton Cmty. Hosp.,
Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir.2009) (quoting
*Daubert*, 509 U.S. at 587, 591–92).

It is undisputed that causation is an essential element of Plaintiffs'
negligence and AEMLD claims. *Rodgers v. AWB Indus., Inc.*, 762 Fed. Appx.
1015, 1021 (11th Cir. 2019); *see also Morguson v. 3M Co.*, 857 So.2d 796, 800
(Ala. 2003). Moreover, in products liability cases, it is generally required that
experts testify on causation due to the often complex and general nature of the
products. *See Verchot v. Gen. Motors Corp.*, 812 So.2d 296, 303 (Ala. 2001).

Because under the First Theory, Plaintiffs' evidence shows that the First
Theory was *not* the cause of Mr. Lyons's injury, the Theory is irrelevant to the
underlying dispute. If the CW9 pistol is dropped, regardless of whether inertial
energy causes the trigger to move and the striker block to displace, it is undisputed
that such phenomenon *does not cause a drop-fire* because the sear will not release
the striker, even upon impact with concrete. (Doc. 51-10 at 30.) During his
deposition, Mr. Powell testified *repeatedly* that even if the striker block is

25

displaced because of trigger movement during a drop, for the CW9 pistol to discharge on impact, the trigger must have already been partially pulled (i.e., the Second Theory must be in effect).[8] (Doc. 51-10 at 30, 47−49.) Not even Mr. Powell's report claims that the First Theory caused Mr. Lyons's incident. (Doc. 58-5.)

In that same vein, Mr. Powell also repeatedly testified that the First Theory had *no causal effect* on the incident with Mr. Lyons because the CW9 pistol's striker does not release on impact during a drop, absent a partial trigger pull. (Doc. 51-10 at 47−48.) Furthermore, Mr. Powell testified that because it is his position that the Subject Pistol's trigger *was* partially pulled before it fell from Mr. Lyons's holster, the trigger would have fully decompressed when the Subject Pistol hit the concrete floor—an action which would have displaced the striker block anyway.[9] (Doc. 51-10 at 49.) That testimony aligns with Mr. Powell's report, as well. He concluded that the Subject Pistol discharged on impact with the concrete because the striker block safety was out of the way *and* the sear released the striker, which the evidence shows only happens when the trigger is fully decompressed. (Doc. 51-10 at 30 and Doc. 58-5 at 5.)

---

[8] If there is already a partial trigger pull, which means the pistol is close to discharge, then the inertial energy during a drop will fully decompress the trigger, which will activate the pistol's internal mechanisms and discharge the pistol. (Doc. 51-10 at 49.)

[9] This is because of the interaction of the trigger, trigger bar, the cocking cam system, and the striker block. *See supra* Section I.A.

26

The Court recognizes that Plaintiffs state that the First Theory demonstrates that the CW9 pistol "could" fire, but that statement, on its face, still fails to establish a showing of causation in this action. Moreover, it is arguably misleading because, again, Mr. Powell's first ten drop tests and his testimony prove that the sear does not release the striker when the pistol drops and hits the ground. (Doc. 51-10 at 30, 47–49 and Doc. 59 at 12.) Additionally, Mr. Powell admitted that during his drop tests, the cartridge's primer remained "pristine." (Doc. 51-10 at 43.) In other words, even though the striker block may have been displaced during his drop tests, the firing pin never contacted the primer—which is the safety block's purpose—because the sear never released the striker. (Doc. 51-10 at 43–44.)

While Mr. Powell's First Theory is unhelpful to a trier of fact because it does not establish causation, the Second Theory *is* helpful as it offers two causation hypotheses. Because causation of Mr. Lyons's injury (i.e., whether his injury was caused by a drop-fire) is a "pertinent inquiry" in this action, the Second Theory passes the third part of the Eleventh Circuit's test. *Daubert*, 509 U.S. at 592.

In sum, under the Eleventh Circuit's test for expert testimony admissibility under *Daubert* and Rule 702, Mr. Powell's testimony surrounding the First Theory is inadmissible, but the rest of his testimony is admissible. That said, the Court

reiterates that the *Daubert* analysis focuses on the "principles and methodology underlying expert opinion testimony, not the conclusions they generate." *McDowell*, 392 F.3d at 1298 (citing *Daubert*, 509 U.S. at 595).

**B.     Kahr is entitled to a judgment on the merits of Plaintiffs' claims.**

Because Mr. Powell's testimony surrounding the Second Theory survives Kahr's motion to exclude, and because Kahr argues in its brief that summary judgment is warranted even if Mr. Powell's testimony is permitted, the Court now turns to Kahr's motion for summary judgment.

1.     *Negligence and the AEMLD*

Kahr's theory of the case is that Mr. Lyons likely pulled the trigger. (Doc. 51 at 9 and Doc. 51-7 at 16.) To support their theory, Kahr rests on the facts that the CW9 pistol has passed various industry and state test protocols[10] for drop-fire scenarios and that no one has demonstrated the pistol can drop fire, absent a manipulated trigger. (Doc. 54 at 3−4.) Kahr also highlights Mr. Watkins's trajectory analysis of the bullet, which it claims is inconsistent with a drop-fire but "consistent with Mr. Lyons attempting to catch the [Subject Pistol] as it fell and accidentally pulling the trigger." (Doc. 51-7 at 9−15.)

---

[10] These include the Sporting Arms and Ammunition Manufacturers' Institute's Standards and the standards mandated by the California Department of Justice and the State of Massachusetts. (Doc. 54 at 6.)

In its motion for summary judgment, Kahr defends its design of the CW9 pistol, asserting that Plaintiffs cannot establish that the design is defective, "much less that [the Subject Pistol] was defective" when it left Kahr's possession in 2010. (Doc. 54 at 4.) Kahr argues that the design *prevents* drop-fires and that Plaintiffs' "only real claim in this case is that the Subject Pistol became unreasonably dangerous when a piece of foreign material somehow lodged into the slide after Plaintiffs acquired it causing a near-complete trigger pull." (Doc. 54 at 21.)

Plaintiffs rebut Kahr's position, maintaining that the CW9 semi-automatic pistol has a design defect that caused the Subject Pistol to fire when it fell from Mr. Lyons's holster and hit the concrete, ultimately injuring him. (Doc. 59 at 1−2.) To reiterate, Plaintiffs' remaining alleged defect in the CW9 pistol, the Second Theory, is that due to the lack of protection of the disconnector tab, the slide or debris in that cavity can move the tab forward, causing a partial trigger pull, which can result in a drop-fire. (Doc. 51-10 at 14 and Doc. 58-5 at 5.) They contend that had Kahr designed the CW9 pistol with a trigger safety, that defect would be cured because it would prevent trigger movement in the event of a dropped pistol. (58-5 at 5.)

a.    The Law

To establish a claim of liability under Alabama's negligence doctrine, a plaintiff must prove: "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty;

(3) proximate causation; and (4) damage or injury." *DISA Indus. v. Bell*, 272 So.3d 142, 152 (Ala. 2018) (internal citations omitted).

Under the AEMLD, a defendant will be liable "if it manufactures, designs, or sells an unreasonably dangerous product that reaches the consumer substantially unaltered and, because of its unreasonably dangerous condition, injures the consumer when it is put to its intended use." *Beam v. Tramco, Inc.*, 655 So.2d 979, 981 (Ala. 1995).

"The manufacturer of a product is not required to produce the safest possible product, but only to produce a product that is reasonably safe when put to its intended use." *Graham v. Sprout-Waldron and Co.*, 657 So.2d 868, 870 (Ala. 1995) (citation omitted). Ergo, "[t]he fact that one sustains an injury from a product does not always establish that the product was unreasonably dangerous." *Beam*, 655 So.2d at 981. For a product to be "unreasonably dangerous," or defective, it must fail to "meet the reasonable safety expectations of an ordinary consumer, that is, an objective ordinary consumer, possessed of the ordinary knowledge common to the community." *Tillman v. R.J. Reynolds Tobacco Co.*, 871 So.2d 28, 32 (Ala. 2003) (internal citation omitted); *Casrell v. Altec Indus., Inc.*, 335 So.2d 128, 133 (Ala. 1976) (stating that the terms "defective" and "unreasonably dangerous" are synonymous with each other). Accordingly, "the plaintiff must *affirmatively show* that the product was sold with a defect or in a

defective condition." *Tanksley v. ProSoft Automation, Inc.*, 982 So.2d 1046, 1051 (Ala. 2007) (emphasis added).

"An essential element of an AEMLD claim is proof that the product reached the consumer without substantial change in the condition in which it was sold." *Sears, Roebuck & Co. v. Harris*, 630 So.2d 1018, 1027 (Ala. 1993). "[T]he plaintiff bears the burden of proving that the product was in a defective condition when it left the defendant's control." *Jordan v. Gen. Motors Corp.*, 581 So.2d 835, 837 (Ala. 1991). That said, an altered or modified product does not necessarily relieve a manufacturer of liability. *Sears*, 630 So.2d at 1027. However, "[w]hen a defect created by an alteration to a product after it left the seller's control is the factual and proximate cause of an injury, and the alteration was not foreseeable, the alteration amounts to an intervening or superseding cause of the injury and relieves the seller from liability under the AEMLD." *Kirk v. Garrett Ford Tractor, Inc.*, 650 So.2d 865, 867 (Ala. 1994).[11]

While negligence and the AEMLD have different elements, there are "measure[s] of commonality" between the two theories in the products liability sphere. *McMahon v. Yamaha Motor Corp.*, 95 So.3d 769, 772 (Ala. 2012). "Specifically, a plaintiff pursuing a products-liability claim against a manufacturer

---

[11] In *Kirk*, the Supreme Court of Alabama affirmed summary judgment because the removal of the protective shield from an auger was a substantial change that relieved the seller from liability for injuries caused when the worker's leg became entangled in the auger. *Kirk*, 650 So.2d at 867.

under either theory can succeed only if the plaintiff establishes that the product at issue is sufficiently unsafe so as to render it defective." *McMahon*, 95 So.3d at 772.

"Although a jury will normally determine the dangerousness of a product, 'certain products whose inherent danger is patent and obvious do not, as a matter of law, involve defects of a sort that a jury should resolve." *Tillman*, 871 So.2d at 32 (quoting *Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1507 (11th Cir. 1990)). For an inherently dangerous product, such as a firearm, once a plaintiff has shown sufficient evidence to support a finding of defectiveness, to recover for negligence or under the AEMLD, the plaintiff must additionally establish "'the existence of a safer, practical alternative design for the allegedly defective product.'" *Garrison v. Sturm, Ruger & Co., Inc.*, 322 F. Supp. 3d 1217, 1225−26 (N.D. Ala. 2018) (citing *Hosford v. BRK Brands, Inc.*, 223 So.3d 199, 208 (Ala. 2016)).

Another "measure of commonality" between negligence and the AEMLD is "proximate cause." *Rodgers*, 762 Fed. Appx. at 1021; *see also Morguson*, 857 So.2d at 800. "The plaintiff has the burden of presenting substantial evidence of proximate cause." *Morguson*, 857 So.2d at 800 (citation omitted). "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact to be proved." *West v. Founders Life Assurance Co. of Florida*, 547 So.2d 870, 871

(Ala. 1989). "'Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new and independent causes, produces an injury or harm and without which the injury or harm would not occur.'" *Id.* (citing *Dillard v. Pittway Corp.*, 719 So.2d 188, 192 (Ala. 1998)). "The cornerstone of proximate cause is foreseeability." *Morgunson*, 857 So.2d at 800 (citations omitted). If there is an unforeseeable intervening cause, then the causal chain is broken. *Vines v. Plantation Motor Lodge*, 336 So.2d 1338, 1339 (Ala. 1976). "The question of proximate cause is almost always a question for the jury," and it "must go to the jury if reasonable inferences from the evidence support the theory of the complaint." *Marshall Cnty. v. Uptain*, 409 So.2d 423, 425 (Ala. 1981).

b.  Analysis

In preliminary matters, there is no dispute that Kahr qualifies as a manufacturer that may be held liable under the AEMLD. Additionally, the product at issue, Kahr's CW9 semi-automatic pistol, is inherently dangerous, as a matter of law. An ordinary objective consumer would expect that the CW9 pistol discharges when the consumer pulls the trigger. However, it is undisputed that the same consumer would reasonably expect that the pistol would not drop fire.

Thus, the Court's analysis turns to address the premise of Kahr's argument: whether, under the Second Theory, Plaintiffs set forth sufficient evidence such that a reasonable jury could find that Kahr's design of the CW9 pistol is defective and

proximately caused the Subject Pistol to drop fire, thereby injuring Mr. Lyons. If Plaintiffs meet that burden, the Court will then evaluate whether a reasonable jury could find that designing the CW9 pistol with a trigger safety would be a safer, practical, alternative design.

Even viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that the Second Theory does not affirmatively show that the CW9 pistol's *design* is "sufficiently unsafe so as to render it defective" or is susceptible to drop-firing. *McMahon*, 95 So.3d at 772. The evidentiary foundation underlying the Second Theory and its causation hypotheses is the "damage" in the Subject Pistol caused by some piece of debris or foreign material.[12]  (Doc. 51-10 at 34.) Mr. Powell testified, more than once, that "[i]f the damage isn't present, and [the disconnector tab] doesn't hook onto the slide to be pulled forward, then it's not going to drop fire." (Doc. 51-10 at 29, 34.) In other words, if there is no damage, then there is no design defect. Mr. Powell's own report stated that the CW9 pistol's disconnect design is "common" amongst striker-fired pistol designs, and the disconnector tab is designed to have contact with the slide. (Doc. 58-5 at 5.) And to state the obvious, the presence of debris or foreign material in the cavity where the disconnector tab sits is *not* part of the CW9 pistol's design. Plaintiffs do not

_____

[12] The terms "debris" and "foreign material" in this opinion do not include grease or dirt (i.e., smaller particles), which the parties agree were present in the Subject Pistol and are generally found in all pistols after being used. (Doc. 51-10 at 28.) There is no genuine dispute that the grease and dirt in the Subject Pistol was not enough to cause a partial trigger pull. (Doc. 51-10 at 14, 28.)

present *any evidence*, or even argument, that based on Kahr's design for the CW9 pistol, debris or foreign material capable of causing a partial trigger pull, such as brass or polymer, can collect in the pistol during ordinary use. In fact, when Mr. Powell manipulated the Exemplar's trigger, he did not push the particles through some opening in the frame: he either took off the slide or locked the slide to the rear and manually placed the particles in the cavity. (Doc. 51-10 at 53.) And at one point in Mr. Powell's deposition, Kahr's counsel asked, "You think that the [CW9] pistol's defective because it's—you can put strategically placed debris in there; right?" (Doc. 51-10 at 78.) Mr. Powell answered, "Yeah, if it had a trigger safety, that wouldn't happen." (Doc. 51-10 at 78.) Based on the evidence, the only reasonable inference is that such particles do not just accumulate in the CW9's pistol when it is used as intended but rather will only be there when someone "strategically" puts them there.

Plaintiffs also fail to show "substantial evidence of proximate cause"—an essential element of their case. *Morguson*, 857 So.2d at 800 (citation omitted). Assuming, *arguendo*, that a jury could find that the presence of debris or foreign material in the pistol or the damage resulting from that presence could cause a partial trigger pull, that presence would qualify as an intervening cause because Kahr could not have reasonably foreseen someone removing or locking the slide and then manually placing particles of debris or foreign material into a *firearm*—

an inherently dangerous product. Such placement would be akin to the removal of the protective shield from an auger, which the Supreme Court of Alabama agreed was unforeseeable. *Kirk*, 650 So.2d at 867.

Moreover, Plaintiffs have not met their burden of proving that the Subject Pistol was in a defective condition when it left Kahr's control in 2010—a requirement to recover under the AEMLD. *Jordan*, 581 So.2d at 837. Both Mr. Powell and Mr. Watkins agree that the damage to the disconnector tab is not the result of normal wear and tear. (Doc. 51-7 at 7 and Doc. 51-10 at 14.) That conclusion is further supported by the fact that Mr. Powell's Exemplar, which did not have a damaged disconnector tab, did not get "dragged forward" by the slide. (Doc. 51-10 at 15.) There is no *genuine* dispute that whatever caused the damage to the disconnector tab and/or a partial trigger pull was *not* in the Subject Pistol at the time it left Kahr's possession. (Doc. 51-10 at 29.) It thus follows that if one of Mr. Powell's hypotheses occurred, such occurrence would qualify as a "substantial change" in the condition of the Subject Pistol. *Sears*, 630 So.2d at 1027. And, as previously analyzed, the change or damage caused by the presence of debris or foreign material would be unforeseeable, so Kahr would be relieved from liability under the AEMLD. *Kirk*, 650 So.2d at 867.

Finally, the evidence underlying the Second Theory's causation hypotheses "is so one-sided that [Kahr] must prevail as a matter of law." *Anderson*, 477 U.S. at

251–52. Regarding the first hypothesis, even if a reasonable jury could find that a piece of debris or foreign material damaged the disconnector tab and scratched the slide, the evidence overwhelmingly suggests that such material was not in the Subject Pistol at the time of Mr. Lyons's incident. Neither Mr. Powell nor Mr. Watkins found debris or foreign material when they examined it. (Doc. 51-10 at 14.) And after purchasing the Subject Pistol, Mr. Lyons *disassembled* it, *cleaned* it, *and* did a functions check. (Doc. 54 at 7.) He fired the Subject Pistol *multiple times*, including the week before the incident. (Doc. 54 at 7.) Nothing suggests there was a piece of debris or foreign material in the Subject Pistol during those times. On the contrary, Mr. Lyons reported that the Subject Pistol functioned properly when he used it. (Doc. 54 at 7.) Again, Plaintiffs' evidence does not show that debris or foreign material can collect in the CW9 pistol, and there is certainly no evidence that Mr. Lyons "strategically" placed anything in the Subject Pistol. Ergo, based on the evidence, a reasonable jury could not find that the first hypothesis caused the Subject Pistol to drop fire.

And the only evidence supporting the second hypothesis is but a "mere scintilla." *Walker*, 911 F.2d at 1577. Even if the Subject Pistol's slide moved the disconnector tab when it released forward, Mr. Powell's own testimony is that the movement was *slight* and that the trigger returned to the full position *every time* he tested it. (Doc. 51-10 at 13, 16, 27.) It is undisputed that the Subject Pistol passed

37

multiple function tests. (Doc. 54 at 10.) Mr. Powell conceded that he never saw the Subject Pistol's disconnector tab dragged forward enough to drop fire. (Doc. 51-10 at 16.) Mr. Powell even admitted that it is simply a possibility that friction between the slide and the damaged disconnector tab, *alone*, could cause a partial trigger pull. (Doc. 51-10 at 74.) Thus, the second hypothesis is pure conjecture, and a reasonable jury could not find that the second hypothesis caused the Subject Pistol to drop fire. *Blackston v. Shook and Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) (holding that an inference based on conjecture is unreasonable).

As an aside, the Second Theory appears to be a "Hail Mary," of sorts. Plaintiffs' opposition to Kahr's motion for summary judgment focuses *solely* on the First Theory. (Doc. 59 at 12.) In fact, in the paragraph which addresses Kahr's issues with Mr. Powell's manipulation of the Exemplar's trigger, and thus is arguably the only point in the brief which touches on the Second Theory, Plaintiffs dismiss the timing of the damage in the Subject Pistol as "irrelevant" because "its trigger had the same inertial energy movement when dropped as every other Kahr pistol." (Doc. 59 at 16.) The absence of argument that the Second Theory precludes summary judgment is telling. Had Mr. Powell not mentioned the Second Theory during the Court's hearing, the Court could have found that Plaintiffs had abandoned it.

In sum, under the Second Theory, Plaintiffs have failed to show a *prima facie* case for products liability under theories of negligence or the AEMLD, which "necessarily renders all other facts immaterial" and mandates a finding of summary judgment. *Celotex*, 477 U.S. at 322.

Because Plaintiffs have not shown there is a genuine dispute of material fact as to whether Kahr's design of the CW9 pistol is defective or unreasonably dangerous, or, said differently, is susceptible to drop-firing, the Court's analysis regarding whether a trigger safety qualifies as a safer, practical, alternative design, is pretermitted.

### 2.    *Breach of Implied Warranty*

Kahr argues that that Plaintiffs' breach of implied warranty claim should be dismissed because the cause of action is subsumed by the AEMLD claim. (Doc. 54 at 25.) In their opposition, Plaintiffs state that they do not contest Kahr's position on that matter. (Doc. 59 at 11.)

In the Eleventh Circuit, "the onus is on the parties to formulate arguments;" if there are grounds alleged in the complaint but not relied upon in a party's motion for summary judgment or opposition brief, then those grounds are "deemed abandoned." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations omitted); *see also Floyd v. Home Depot U.S.A.*, 274 Fed. Appx. 763, 765 (11th Cir. 2008) (finding that the district court properly determined that Floyd had

abandoned his retaliation termination claim because in his opposition to Home Depot's motion for summary judgment, he did not respond to Home Depot's argument on that claim).

Here, Plaintiffs have not only failed to respond to Kahr's argument on the breach of warranty claim, but they have also, in their brief, announced their intent *not* to do so. As such, the Court finds that Plaintiffs have abandoned their breach of implied warranty claim and that dismissal of that claim is appropriate on that basis.

### 3.   *Wantonness and Punitive Damages*

Wantonness requires a showing of "the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Ex parte Essary*, 992 So.2d 5, 9 (Ala. 2007). Because Plaintiffs have not established that Kahr's CW9 pistol is defectively designed, it follows that they cannot establish that Kahr designed the pistol while *knowing* the pistol could drop fire. Thus, Plaintiffs' claim for wantonness, to the extent it exists, is also due to be dismissed.

The Court also recognize that the parties disagree on whether Plaintiffs may recover punitive damages. (Doc. 54 at 26 and Doc. 59 at 17.) However, because summary judgment is due to be granted, and because punitive damages are a type

of remedy and are not a separate cause of action, the Court need not address parties' arguments on that disagreement.

## IV.    CONCLUSION

Based on the foregoing analysis, the Court **GRANTS IN PART** and **DENIES IN PART** Kahr's motion to exclude Mr. Powell's testimony. (Doc. 51.) Nevertheless, even with that testimony, Plaintiffs have failed to make a *prima facie* case for negligence or liability under the AEMLD, and Kahr is entitled to a judgment on the merits under Federal Rule of Civil Procedure 56. Thus, the Court **GRANTS** Kahr's motion for summary judgment and **DISMISSES** Plaintiffs' claims **with prejudice**. (Doc. 53.) And, for the reasons already discussed, Mrs. Lyons's claim for loss of consortium is also due to be dismissed because it is derivative of the claims of the injured spouse, Mr. Lyons. *Ga. Power Co. v. Partin*, 727 So.2d 2, 6 (Ala. 1998). A final judgment will be entered separately.

**DONE** and **ORDERED** March 31, 2023.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE